**Jean–Christophe BLANC, France, Petitioner,**

v.

**Jennifer MORGAN, Respondent.**

**Case No. 2:10–cv–02314.**

United States District Court,
W.D. Tennessee,
Western Division.

July 9, 2010.

C. Suzanne Landers, Lucie K. Brackin, The Landers Firm, Memphis, TN, for Petitioner.

Lauren Pasley–Ward, Law Office of Lauren Pasley–Ward, Memphis, TN, for Respondent.

## ORDER GRANTING VERIFIED PETITION FOR RETURN OF CHILD

BERNICE BOUIE DONALD, District Judge.

On April 27, 2010, Petitioner Jean–Christophe Blanc ("Father") filed a verified petition in the United States District Court for the Western District of Tennessee pursuant to the 1980 Hague Convention on the Civil Aspects of International Child Abduction ("Hague Convention" or "Convention"), Oct. 24, 1980, T.I.A.S. No. 11670, S. Treaty Doc. No. 99–11, and the International Child Abduction Remedies Act, 42 U.S.C. § 11601 *et seq.* In addition to other ancillary relief, Father seeks an order compelling the return of his daughter, "M."[1]—age four—from M.'s mother, Respondent Jennifer Morgan ("Mother").[2] Mother filed a verified answer on May 17, 2010. This Court has jurisdiction pursuant to 28 U.S.C. § 1331 ("The district courts shall have original jurisdiction of all civil actions arising under the Constitution, laws, or treaties of the United States.") and 42 U.S.C. § 11603(a) ("The courts of the States and the United States district courts shall have concurrent original jurisdiction of actions arising under the Convention."). On Thursday, July 1, 2010,[3]

---

1. To protect the privacy of the minor child, the Court will refer to her solely by the initial letter of her first name.

2. Even though she is identified in court pleadings and many official documents as "Jennifer Morgan," Mother testified that she is known by her middle name "Whitney."

3. Courts are directed to employ "the most expeditious procedures available" to adjudicate a petition seeking the return of a child under the Hague Convention and ICARA. *March v. Levine,* 249 F.3d 462, 474–75 (6th Cir.2001) (quoting Hague Convention, art. 2). The Clerk originally assigned this case to a United States Magistrate Judge. *See* W.D. Tenn. L.R. 83.3(a)(1), (4). The Clerk later assigned the case to the undersigned judge on May 13, 2010. On May 14th, the Court issued an order setting an emergency status conference for May 21st and directed the United States Marshal to serve Mother with a copy of the Court's order because Mother had not yet appeared in this case and the Court was unaware of any counsel representing Mother at the time. Following the May 21st status conference, the Court set an evidentia-

the Court conducted an evidentiary hearing at which the Court heard from three witnesses: Father, Mother, and Mother's mother (Ms. Sharon Morgan). After reviewing the evidence, considering the testimony of the witnesses called by each party, and weighing the credibility of those witnesses, the Court **GRANTS** Father's petition for the reasons stated herein.

## I. FINDINGS OF FACT [4]

Father, age 44, is a citizen and resident of France. Mother, age 33, is a citizen and resident of the United States and currently resides in the Cordova area of Shelby County, Tennessee. Mother and Father first met in 1998 or 1999 [5] when Mother applied for a position with a Memphis restaurant at which Father was then employed as an executive chef. Shortly thereafter, the restaurant hired Mother as a pastry chef. During the course of their employment at the restaurant, Mother and Father began a romantic relationship.

In early February 2001, Mother and Father together moved to France. Upon first arriving in France, Mother and Father lived with Father's mother. Soon after Mother and Father began living with Father's mother, Father and Father's mother became engaged in an argument. In the course of the argument, Father's mother physically attacked Mother, pulled Mother's hair, and knocked Mother to the ground. Father intervened in an effort to stop the attack. Mother attempted to place a phone call to authorities for help, but Father's mother disconnected the phone before Mother could complete the call. After this incident, Mother and Father moved out of Father's mother's house, first staying with friends and later moving into their own apartment. Father then contracted for the construction of a house into which Mother and Father moved upon its completion.

Mother and Father continued their romantic relationship while living together in Juvignac, France, though they never married. Mother worked with Father in a restaurant at which they were the only two employees. Each year, Mother applied for and received a *carte de séjour*—roughly the French equivalent of a U.S. green card—which allowed her to stay in France. Mother also took a course and received a certificate enabling her to teach English as a second language in France, but she was never able to secure a teaching position. In 2005, Mother became pregnant with M. by Father,[6] and M. was born January 2, 2006 in Montpellier, France. Once M. was born, Mother completed paperwork with the U.S. Consul in Paris and obtained official recognition of M.'s birth abroad and U.S. citizenship. Accordingly, M. is a citizen of both France and the United States. After M.'s birth, Mother—with Father's consent—took M. on trips to the United States on five separate occasions, staying

ry hearing, at Mother's request, for the earliest available court date mutually convenient to the parties.

**4.** The following findings of fact are based upon the evidence presented at the hearing of July 21, 2010. In the interest of deciding this matter quickly, the Court will to render its opinion without awaiting an official transcript from the Court Reporter.

**5.** The record is unclear as to the exact year of Mother and Father's first meeting, but this minor discrepancy is irrelevant to this case.

**6.** There is no question raised by either party as to paternity. Additionally, all of the official documentation from French authorities presented to the Court—including M.'s birth certificate, her "family book" from the French government, and the final order from the French court—as well as the U.S. Consular Report of U.S. Birth Abroad recognizes Father as M.'s father.

for at least a month each time before returning to France.

Even before the birth of their daughter, Mother and Father's relationship was ambivalent, and Mother was frequently unhappy, in large part due to the fact that she did not speak French very well and had very few friends in France. It also appears that after M.'s birth, Mother and Father's relationship deteriorated further—the two ceased having a sexual relationship—and Mother told Father on many different occasions that she was going to leave him. Mother testified that she and Father argued with increased frequency over time and that, as time passed, Father's comments to Mother became verbally and psychologically abusive.[7] In her testimony, however, Mother was unable to identify any instances of physical abuse toward her by Father. The record also lacks any evidence that Father ever physically abused M. or made abusive comments to the child. Although M. may not have as strong a relationship with Father as with Mother, the Court credits Father's testimony that he is close to M. and is involved in her life.[8]

In the summer of 2008, an incident occurred in which Father returned to the couple's home inebriated by an evening of drinking, began vomiting, and passed out. Mother attended to Father, but the next morning Father became angry with Mother because he felt that Mother had been insufficiently concerned about the nature of his condition and had thereby placed his life in jeopardy. Mother testified that after this incident she decided she needed to terminate her relationship with Father.

Around this same point in time, Mother learned from a French dermatologist that she had carcinoma, but it appears that the seriousness of this diagnosis was not fully appreciated at the time—at least not by Father, and perhaps not by Mother as well.

In September 2008, Father drove Mother and M. to the airport for their departure on yet another trip to the United States. Father testified that when Mother and M. left for the United States in September 2008, he fully expected that the two would return to France after a month or so, as had been the case with their previous trips. Given all of the surrounding facts, the Court finds that Father's belief about Mother's intentions was reasonable. Specifically, Mother had purchased roundtrip tickets, left a large amount of clothing and other personal items at their home in France, did not close her French bank account, and kept bills jointly in her and Father's names. Mother also asked Father to pick up her renewed *carte de séjour*, as it was issued shortly after she departed for the United States.

In the United States, Mother and M. moved in with Mother's mother—Ms. Sharon Morgan—with whom the two have lived since. Mother has remained in regular and frequent contact with Father since returning to the United States and has allowed contact between M. and Father through Skype and telephone calls to the extent feasible for a young child. Once in the United States, Mother began a course of treatment for her cancer, including a

---

7. The Court notes that Mother was not very specific in describing what especially improper or abusive comments Father allegedly made to her. Indeed, while the Court has no doubt that Mother and Father argued and probably argued more often after M.'s birth, the Court declines to find that Father's com-

ments were so untoward as to constitute verbal or psychological "abuse."

8. Father's contention is supported by the numerous photographs attached to his petition showing him with M. and engaged in such activities as feeding and playing with M. since her birth.

major surgical operation in December 2008—all of which Mother communicated to Father. In October 2008, Mother secured employment with FedEx in Memphis, which she has maintained. Mother sent Father a Christmas card in December 2008 signed "Love, Whitney and [M.]." (July 1, 2010 Evid. Hr'g Ex. 17: Christmas Card.)

Father visited Mother and M. in Memphis in February 2009. During the trip, Father slept in Mother's room in the home of Mother's mother, while Mother slept on a couch in another room of the house. Mother rebuffed Father's attempts to show Mother physical affection and refused to commit to return to France at a precise time in the future. Father testified that he proposed marriage during this trip, but in her testimony Mother adamantly denied that Father proposed to her. Mother admitted that she probably told Father at this time that their relationship was over. During his trip, Father broached with Mother the possibility that he would retain an attorney to protect his parental rights, though Father's testimony indicated that he may have sought legal advice even before February 2009.

Based upon Mother's comments to him during his February 2009 trip and developments in the weeks that followed, Father concluded that Mother no longer intended to return to live with him in France and that legal action to protect his parental rights was necessary. Acting through counsel, Father then initiated legal proceedings in April 2009 by summoning Mother to appear at a hearing before the family affairs judge of the County Court of Montpellier (France). Mother, however, did not receive proper process or timely notice of the court's scheduled hearing. On June 18, 2009, the Montpellier County Court held a hearing at which Father presented evidence regarding Mother's removal of M. to the United States and her refusal to return to France with the child. Lacking notice of the hearing, Mother did not appear. The court apparently took the matter under advisement, as it did not immediately issue a ruling. Mother received her first legal papers related to these proceedings on July 13, 2009. Upon receiving papers in July, Mother retained an attorney in Memphis, who then contacted Father's counsel in France on Mother's behalf.

The Montpellier County Court issued its decision on September 3, 2009. Translated, the court's order reads, in pertinent part, as follows:

> At the hearing of June 18, 2009, [Father] states that on September 19, 2008, [Mother] told him she wanted to go for a few weeks to the USA to her parents' home to review the future of their couple [*sic*]; that he did not object to her bringing [M.] with her as such for several stays [*sic*] in the USA and to [return] to France ... after the few weeks of vacation; that once in the USA ... [Mother] informed him that she had a brain tumor and that she was to be operated on at the end of the year 2008; therefore[,] he waited and at the start of March 2009, [Mother] told him she no longer wanted to go back to France and was going to stay in the USA with the child. Putting forward that he had the parental authority jointly with [Mother] regarding the child and that the child's usual residence was in France, he asks, in application of articles 3 and 12 of the Hague Convention ratified by France on December 1, 1983 and by the USA on July 1, 1988, for the return of the child to France.
>
> [...]
>
> It is established that until her departure to the USA with her mother, in September 2008, the child had resided usually

at her residence in Juvignac since her birth.

But [Mother] who was to go to the USA for a simple stay decided unilaterally to reside there with the child depriving [Father] from the normal exercising of his prerogatives as holder of parental authority. The fact of fixing a new place of residence for the child, abroad, without the agreement of the other parent, constitutes an illicit non-return, within the meaning of the covenant of October 25, 1980, justifying that the child's return be immediately ordered.

[...]

[The Court] ... **ORDERS** the immediate return of the child [M.] to her usual place of residence at [Father's] residence, in France.

(July 1, 2010 Evid. Hr'g Ex. 12: Official Translation of September 3, 2009 Order of the County Court of Montpellier (identifications of parties and child in original altered).) Mother did not learn of the French court's September 3rd order until November 2009.

Father subsequently filed a "Request for the Return of an Abducted Child Pursuant to the Hague Convention of 25 October 1980" with the designated French Central Authority. Father's application was stamped filed with the French Central Authority on February 16, 2010. The French government then forwarded the application to the United States Central Authority—the U.S. State Department's Office of Children's Issues. Father filed his verified petition in this Court on April 27, 2010.

M. has been enrolled in day care since shortly after her entry into the United States in September 2008 and is currently enrolled in a summer camp. M. is scheduled to begin pre-kindergarten at Farmington Presbyterian Day School at the end of the summer. Ms. Sharon Morgan, M.'s grandmother, is actively involved in M.'s life and cares for her when Mother cannot. Mother's sister also helps from time to time in caring for M. During his visits to the United States, Father spends his time with M. The evidence indicates that M. is comfortable with Father and responds positively to him. The Friday before the Court's July 1st hearing, Mother picked up Father at the Memphis airport and placed M. in Father's care for the weekend.

## II. CONCLUSIONS OF LAW

### A. The Framework of the Hague Convention and ICARA

Adopted in 1980 at the Fourteenth Session of the Hague Conference on Private International Law, the Hague Convention on the Civil Aspects of International Child Abduction, Oct. 24, 1980, T.I.A.S. No. 11670, S. Treaty Doc. No. 99–11, [hereinafter "Hague Convention"], was ratified by the United States in 1988 and implemented by means of the International Child Abduction Remedies Act ("ICARA"), 42 U.S.C. § 11601 *et seq.*, with the goal of preventing parents involved in custody disputes from using the abduction or removal of children from their home jurisdictions as a means of forum shopping. *See Gitter v. Gitter*, 396 F.3d 124, 129–30 (2d Cir. 2005); *see also Abbott v. Abbott*, —— U.S. ——, 130 S.Ct. 1983, 1995–96, 176 L.Ed.2d 789 (2010) (noting as a purpose of the Convention the "deterring [of] child abductions by parents who attempt to find a friendlier forum for deciding custodial disputes"). "The Convention consequently places at the head of its objectives the restoration of the status quo, by means of the prompt return of children wrongfully removed to or retained in any Contracting State." *Gitter*, 396 F.3d at 130 (internal quotation marks and citations omitted). France, like the United States, is a Hague Convention signatory and contracting state. *See* Hague Conference on Private

International Law, Status Table: 28: Convention of 25 October 1980 on the Civil Aspects of International Child Abduction, (last updated Apr. 6, 2010), http://hcch.e-vision.nl/index_en.php?act=conventions.status&cid=24 (last visited July 6, 2010).

Under ICARA, a petitioner initiates judicial proceedings for the return of a wrongfully removed or retained child "by commencing a civil action by filing a petition for the relief sought in any court which has jurisdiction of such action and which is authorized to exercise its jurisdiction in the place where the child is located at the time the petition is filed." 42 U.S.C. § 11603(b). The court in which the action is brought is then directed by 42 U.S.C. §·11603(d) to decide the case in accordance with the terms of the Hague Convention. *Barzilay v. Barzilay*, 536 F.3d 844, 847 (8th Cir.2008). A court adjudicating a petition under the Hague Convention and ICARA must remain mindful of two overriding principles: "First, a court in the abducted-to nation has jurisdiction to decide the merits of an abduction claim, but not the merits of the underlying custody dispute. Second, the Hague Convention is generally intended to restore the pre-abduction status quo and to deter parents from crossing borders in search of a more sympathetic court." *Friedrich v. Friedrich ("Friedrich II")*, 78 F.3d 1060, 1063–64 (6th Cir.1996) (internal citations omitted).

When seeking an order to compel a child's transfer to another Hague Convention country, the petitioner bears the burden of demonstrating by a preponderance of the evidence "that the child has been wrongfully removed or retained within the meaning of the Convention." 42 U.S.C. § 11603(e)(1)(A). Article 3 of the Hague Convention defines a "wrongful removal or retention" as an action that breaches the rights of custody of the petitioner under the laws of the country in

which the child was habitually resident immediately prior to the removal or retention. Hague Convention, art. 3. The petitioner must show that he or she was actually exercising those rights of custody or would have been exercising those rights but for the wrongful removal or retention. *Id.* Thus, the petitioner in a civil action under § 11603(b) must prove that "(1) the habitual residence of the child immediately before the date of the allegedly wrongful removal or retention was in the country to which return is sought; (2) the removal or retention breached the petitioner's custody rights under the law of the child's habitual residence; (3) the petitioner was actually exercising or would have been exercising custody rights of the child at the time of his or her removal or retention; and (4) the child has not attained the age of 16 years." *Mendez Lynch v. Mendez Lynch*, 220 F.Supp.2d 1347, 1357 (M.D.Fla.2002) (citations omitted); *see Miltiadous v. Tetervak*, 686 F.Supp.2d 544, 548 (E.D.Pa. 2010). A petitioner who satisfies this burden is generally entitled to an order directing the return of the child to the child's habitual residence, unless the respondent can establish one (or more) of the narrow exceptions or defenses contemplated by Articles 12, 13, or 20 of the Convention. *See* 42 U.S.C. § 11601(a)(4) ("Children who are wrongfully removed or retained within the meaning of the Convention are to be promptly returned unless one of the narrow exceptions set forth in the Convention applies."); *Ohlander v. Larson*, 114 F.3d 1531, 1534 (10th Cir.1997); *Mendez Lynch*, 220 F.Supp.2d at 1357; *Cerit v. Cerit*, 188 F.Supp.2d 1239, 1243–44 (D.Haw.2002); *Armiliato v. Zaric–Armiliato*, 169 F.Supp.2d 230, 236 (S.D.N.Y.2001).

Under Article 12 of the Hague Convention, the petitioned court is not required to return the child if the proceedings were commenced more than one year after the date of the wrongful removal or retention

and the child is "now settled in its new environment." Hague Convention, art. 12. Additionally, under Article 13a, the child's return is not required where the petitioner was not "actually exercising ... custody rights at the time of removal or retention, or had consented to or subsequently acquiesced in the removal or retention." *Id.* art. 13a. "[I]n the absence of a ruling from a court in the country of habitual residence ... [a petitioned court should] liberally find 'exercise' whenever a parent with *de jure* custody rights keeps, or seeks to keep, any sort of regular contact with his or her child." *Friedrich II,* 78 F.3d at 1065; *see Hazbun Escaf v. Rodriquez,* 200 F.Supp.2d 603, 612 (E.D.Va.2002) ("[W]hether a parent was exercising lawful custody of a child at the time of retention must be determined under the law of the child's habitual residence."). A respondent is required to establish the defenses provided under Articles 12 and 13a by a preponderance of the evidence. *See* 42 U.S.C. § 11603(e)(2)(B).

Article 13b excuses a child's return if the respondent establishes by clear and convincing evidence that "there is a grave risk that return would expose the child to physical or psychological harm or otherwise place the child in an intolerable situation," and Article 20 likewise allows the court to decline to order the child's return if the respondent shows—again, by clear and convincing evidence—that the return "would not be permitted by the fundamental principles" of the United States "relating to the protection of human rights and fundamental freedoms." Hague Convention, arts. 13b, 20; *see* 42 U.S.C. § 11603(e)(2)(A). Finally, the Convention allows the court to reject a petition for a child's return if the court finds that "the child objects to being returned and has attained an age and degree of maturity" such that it is "appropriate to take account" of the child's views. Hague Convention, art. 13.

■ Each of these exceptions is meant to be narrowly construed, and none is intended to authorize the petitioned court "to exceed its Hague Convention function by making determinations, such as who is the better parent, that remain within the purview of the court with plenary jurisdiction over the question of custody." *Blondin v. Dubois,* 189 F.3d 240, 246 (2d Cir. 1999).

**B. Father's Prima Facie Case**

■■ In order to consider the merits of Father's petition in accordance with the legal principles described above, the Court must determine "(1) when the removal or retention [of the child] took place; (2) the child's habitual residence immediately prior to such removal or retention; (3) whether the removal or retention breached the petitioner's custody rights under the law of the child's habitual residence; and (4) whether the petitioner was exercising his or her custody rights at the time of removal or retention." *Tsai–Yi Yang v. Fu-Chiang Tsui,* 499 F.3d 259, 270–71 (3d Cir.2007) (citations omitted). If Father can establish a prima facie case of wrongful removal or retention cognizable under the Hague Convention, then the burden shifts to Mother to demonstrate an exception to the general rule that a wrongfully removed or retained child must be returned to the child's country of habitual residence. *See, e.g., Silvestri v. Oliva,* 403 F.Supp.2d 378, 384 (D.N.J.2005).

*1. M.'s Habitual Residence*

■ The Hague Convention and ICARA are silent as to the definition of "habitual residence" as it is used in the treaty, which has left courts to grapple with the meaning to be ascribed to the term. *See generally Mozes v. Mozes,* 239 F.3d 1067, 1071–82 (9th Cir.2001) (Kozinski, J.) (discussing judicial approaches to defining "habitual residence" and establishing framework for de-

termining "habitual residence"); *see also Koch v. Koch,* 450 F.3d 703, 712–15 (7th Cir.2006) (adopting *Mozes* framework for determining "habitual residence"). Courts generally state that inquiry into habitual residence requires analysis of the particular facts of each individual case and a "focus[ ] not upon a child's domicile, or legal residence, but where the child physically lived for an amount of time sufficient for acclimitization and which has a degree of settled purpose from the child's perspective." *Antunez–Fernandes v. Connors–Fernandes,* 259 F.Supp.2d 800, 810 (N.D.Iowa 2003) (internal quotation marks and citations omitted).

M. was born in France while Mother and Father were permanently and indefinitely living together in that country. Notwithstanding the fact that Mother brought M. on several extended trips to the United States after her birth, the majority of M.'s life prior to September 2008 was spent in France. Mother has—at least at one point in this controversy—asserted that M. possessed the status of an habitual resident of both France and the United States. The Sixth Circuit, however, has rejected the notion that a child may possess more than one habitual residence at any one time. *Friedrich v. Friedrich ("Friedrich I"),* 983 F.2d 1396, 1401 (6th Cir.1993) ("A person can have only one habitual residence."); *see, e.g., Freier v. Freier,* 969 F.Supp. 436, 440 (E.D.Mich.1996); *see also Mozes,* 239 F.3d at 1075 n. 17 (noting that "[t]he exception would be the rare situation where someone consistently splits time more or less evenly between two locations, so as to retain alternating habitual residences in each."). Disallowing more than one habitual residence also furthers the aims of the Hague Convention by facilitating recognition of one, and only one, country as the proper forum for deciding questions of custodial and parental rights. Thus, the Court concludes that M. was an habitual resident of France from birth until her removal to the United States in September 2008.

The Court further concludes that Mother's September 2008 removal of M. to the United States did not alter M.'s status as an habitual resident of France. Courts generally look to "the parents' last shared intent" when confronted with the question of whether an habitual residence has changed. *Koch,* 450 F.3d at 715. "[W]here the child's initial translocation from an established habitual residence was clearly intended to be of a specific, delimited period ... courts have generally refused to find that the changed intentions of one parent led to an alteration in the child's habitual residence." *Mozes,* 239 F.3d at 1077. When Mother departed France with M., Father undoubtedly anticipated that the two would return within a month or so, as had been the case with their previous visits to the United States. Given Mother's past pattern of extended trips, her purchase of roundtrip plane tickets, her decision to leave personal items at their home, her maintenance of a French bank account and bills in her name, and her request of Father to pick up her renewed *carte de séjour* for her, Father's belief that Mother and M. would return was reasonable. Moreover, the evidence strongly suggests that at the time of her departure, Mother in fact intended to return to France with M. and only later changed her intentions.

Father acquiesced in Mother's decision to remain in the United States so that she could receive and recover from treatment for cancer as well as spend time with her family during her recovery, but the record is clear that Father expected Mother and M. to soon return. Although Mother at some point changed her mind about returning to France, she was less than forthcoming with Father about her decision until she made her intentions clear in March 2009. As a result, Father spent many

months believing that Mother and M. would return to France to live with him once Mother's health and other circumstances allowed.[9] It would be contrary to the purposes of the Hague Convention and ICARA to allow one parent to unilaterally change a child's habitual residence by using ambiguity and misrepresentation to indirectly induce the other parent to consent to the child's living in another country for an indefinite period of time. Thus, the Court finds that, even though the point of Mother and M.'s return was not fixed by any precise date, Father's permission for M. to continue living in the United States was only for a limited duration—namely, a period of time reasonably necessary for Mother's medical treatment and recovery—and was contingent upon the understanding that Mother intended to return with M. to France. Once Father began to suspect that Mother would not return to France, Father sought legal advice to determine his rights as a parent, which ultimately resulted in the filing of an action against Mother in France roughly six months after Mother and M's arrival in the United States. Under these circumstances, the Court declines to find that Father's failure to insist upon a definite date of return resulted in a loss of his ability to determine his daughter's habitual residence, particularly since his assent was induced by Mother's failure to disclose her own intentions honestly and unequivocally. *Cf. Mozes*, 239 F.3d at 1077 ("[In some cases] ... circumstances are such that, even though the exact length of the stay was left open to negotiation, the court is able to find no settled mutual intent from

which such abandonment [of an habitual residence] can be inferred.").

### 2. "Wrongful Removal or Retention"—Rights of Custody and Timing

Mother does not contest that one parent's refusal to return a child to its family home violates the non-consenting parent's rights of custody under French law. *See* C. Civ. arts. 372–87. Mother instead argues first that Father consented to M.'s living indefinitely in the United States and that—even assuming Father did not consent—Mother's wrongful removal or retention occurred in either September 2008 or March 2009.[10] The Court finds that Mother's wrongful retention occurred in March 2009, as this is the point at which Mother made explicit her intention to live with M. in the United States and thereby separate M. from Father.

### 3. Father's Exercise of Rights

The final element Father must establish is that he was actually exercising or would have been exercising custody rights over M. at the time of the child's removal or retention. While Mother and M. were in France, Father clearly exercised his rights. Mother and M. lived with Father, and Father was involved in M.'s life. After Mother and M. came to the United States, Father remained in contact with M., though his ability to do so effectively was obviously hampered by the fact that their communication could only be conducted through a phone call or Skype and M. is a young child. Father has visited M. in the United States and spent extensive

---

**9.** Even at the Court's hearing of July 1st, Mother continued her ambiguity, testifying that she has only ever said that she would not return to live with Father, not that she would refuse to return to France. In light of Mother's economic dependence on Father while living in France—resulting, it appears, from her limited command of the French language—Mother's distinction between returning to France and returning to Father is, realistically speaking, not very meaningful.

**10.** As discussed below, Mother contends that, irrespective of which date is used, Father's petition is untimely.

time with her during those trips. Thus, the Court finds that Father exercised his custodial rights prior to M.'s removal from France and Father would have continued to exercise those rights but for Mother's removal of M. from France. Accordingly, Father satisfies the final requirement for a petition for return under the Hague Convention.

## C. Mother's Defenses

Having found that Father has established a prima facie case for M.'s return to France, the Court must next consider Mother's defenses to determine whether she can demonstrate a basis for relief from removal pursuant to one of the narrow exceptions recognized by law.

### 1. Article 12: Passage of Year and Settlement of Child in New Environment

For her primary defense, Mother relies upon the exception created by Article 12 of the Hague Convention, which states, in pertinent part:

> Where a child has been wrongfully removed or retained in terms of Article 3 and, at the date of the commencement of the proceedings before the judicial or administrative authority of the Contracting State where the child is, a period of less than one year has elapsed from the date of the wrongful removal or retention, the authority concerned shall order the return of the child forthwith.
>
> The judicial or administrative authority, even where the proceedings have been commenced after the expiration of the period of one year referred to in the preceding paragraph, shall also order the return of the child, unless it is demonstrated that the child is now settled in its new environment.

Hague Convention, art. 12. Stated differently, Article 12 establishes a one-year limitations period circumscribing the power of a petitioned court. If the petitioner initiated proceedings within a year of the child being wrongfully removed or retained, the court must order the child's return in the absence of some other exception or defense. If a year or more elapsed between the wrongful removal or retention and petitioner's initiation of proceedings, the court need not order the child's return if the respondent establishes by a preponderance of the evidence that the child is "now settled in its new environment."

### a. Date of Wrongful Removal or Retention

■ As concluded above, the Court finds that the date of Mother's wrongful retention—specifically, the final end of any pretense by Mother that she intended to return to France with M.—occurred sometime in March 2009. Although Mother offered indications of her hesitancy to return with M. before this point, the Court finds that March 2009 was the first point at which Father was truly on notice of Mother's decision not to return or allow M. to return.

### b. Commencement of Proceedings

■ Therefore, Father needed to file a proper petition for M.'s return before March 2010. Father did not file the instant petition with this Court until April 27, 2010. Mother argues that neither Father's filing of legal action in the County Court of Montpellier (France) nor his later filing with the French Central Authority constitutes a "commencement of proceedings" as contemplated by Article 12. The Court agrees.[11] According to 42 U.S.C.

---

**11.** The Court also agrees with Mother that the judgment of the French Court in this case is not entitled to full faith and credit or, under

these circumstances, even deference as a mat-

§ 11603(f)(3), the phrase "commencement of proceedings" is defined as the filing of an action pursuant to § 11603(b), which means filing a petition in a court "authorized to exercise its jurisdiction in the place where the child is located at the time the petition is filed," 42 U.S.C. § 11603(b). *See Wojcik v. Wojcik,* 959 F.Supp. 413, 418–19 (E.D.Mich.1997); *cf. Sorenson v. Sorenson,* No. 07–4720 (MJD/AJB), 2008 WL 750531, at *1 (D.Minn. Mar. 19, 2008). Making an application with the United States Central Authority is also insufficient to constitute a commencement of proceedings. *Wojcik,* 959 F.Supp. at 420. Instead, given that M. has been located in Shelby County, Tennessee since leaving France, only certain Tennessee state courts and the United States District Court for the Western District of Tennessee have possessed the authority—as a matter of original jurisdiction—to order M.'s return.[12] Thus, Father could only commence proceedings under the Hague Convention and ICARA by filing a petition in one of these courts. Father did not file his first such petition until April 27, 2010— more than one year after March 2009. Accordingly, the Court finds that the filing of the instant petition is not subject to the mandatory return provision of Article 12.

Rather, the Court must determine whether M. has become settled in her new environment.[13]

### c. Whether M. Has Become Settled in Her New Environment

█ The Hague Convention and ICARA fail to define what constitutes becoming "settled" in a new environment. Courts applying the term have stated that for a child to be deemed settled, "there must ... be evidence that the ... [child is] ... in fact settled in or connected to the new environment so that, at least inferentially, return would be disruptive with likely harmful effects." *In re Robinson,* 983 F.Supp. 1339, 1345 (D.Colo.1997). "Among the factors considered by the courts in determining whether a child is settled in her new environment are the age of the child, the stability of the child's residence in the new environment, whether the child attends school or day care consistently, whether the child attends church regularly, the stability of the ... [respondent's] ... employment, and whether the child has friends and relatives in the new area." *In re Koc,* 181 F.Supp.2d 136, 152 (E.D.N.Y.2001); *see Wojcik,* 959 F.Supp. at 420; *see also In re Ahumada Cabrera,* 323 F.Supp.2d 1303, 1314 (S.D.Fla.2004).

ter of comity. *See Diorinou v. Mezitis,* 237 F.3d 133, 140–43 (2d Cir.2001).

**12.** The one possible caveat to this statement is that M. may have been taken out of Shelby County or the jurisdiction of the U.S. District Court for the Western District of Tennessee for vacations or other brief trips since September 2008, but the legal import of any such excursions need not be decided in the context of this case. The Court thus does not address the question of whether a court possessing jurisdiction over the territory into which a child has been brought for only temporary purposes (e.g., a daytrip or a brief vacation of only a few days in a U.S. state different from the U.S. state in which the child is normally located) would thereby obtain authority to hear a petition for the child's removal to a

foreign nation if the petition is filed before the child exits the jurisdiction.

**13.** Equitable tolling of the one-year period may be appropriate where the abducting parent has engaged in misconduct by intentionally concealing the child. *See Duarte v. Bardales,* 526 F.3d 563, 570 (9th Cir.2008); *see, e.g., Van Driessche v. Ohio–Esezeoboh,* 466 F.Supp.2d 828, 848–54 (S.D.Tex.2006). Equitable tolling might have been applicable during the time that Mother concealed her intention not to return to France, but there is no basis for tolling the one year from March 2009 after Mother's intentions became clear to Father and Father even filed legal action— albeit in a court lacking jurisdiction to order M.'s return under the Hague Convention.

■ Several factors weigh in favor of finding that M. has become settled with Mother in the United States. Specifically, M. lives with Mother and Ms. Sharon Morgan (M.'s grandmother) in a stable home, and Mother is now employed with FedEx. M. has traveled on family vacations with her grandmother, regularly attends day care, and is now enrolled in a summer camp with pre-kindergarten attendance to begin at the end of the summer. Over this period of time, M. has developed bonds with her grandmother and also her aunt. The age of the child is an important factor in considering the significance of facts suggesting that a child has become settled, *see In re Robinson*, 983 F.Supp. at 1345–46, and at least one court has held that a four-year-old is of sufficient age to develop the meaningful community ties that result in a child becoming "settled" within the understanding of the Hague Convention, *Zuker v. Andrews*, 2 F.Supp.2d 134, 141 (D.Mass. 1998). On the other hand, the Court lacks evidence that M. is so extensively involved in activities or has developed connections within the community such that she would suffer an undue disruption if she were returned. *Compare Bocquet v. Ouzid*, 225 F.Supp.2d 1337, 1349 (S.D.Fla.2002) ("[Respondent] . . . has not met his burden to prove by a preponderance of the evidence that [the child] is settled here, for he has not offered any evidence—let alone substantial evidence—that [the child] has been in school, been involved in a play group, attended any religious institution, played in any organized sport teams, or established any other significant connections here.") (citing several illustrative cases) *with Zuker*, 2 F.Supp.2d at 141 ("[The child] . . . has attended the Waltham Day Care Center on a full-time basis. . . . The Executive Director states that since 1996, '[the child] . . . has grown and thrived academically and socially' and '. . . attends birthday parties and playdates at his home and at the home of his friends.' He has

'established relationships with teachers, children and other staff.' He sees his grandmother two or three times a week and has 'bonded' with her.").

After carefully evaluating and weighing all of the evidence in this case, the Court concludes that Mother has not carried her burden of establishing by a preponderance of the evidence that M. has become settled in her new environment. The evidence of M.'s ties to the Memphis area in this case is not especially specific and is not as substantial as the evidence in other cases wherein courts have found that children of a similar age were settled. *See, e.g., Muhlenkamp v. Blizzard*, 521 F.Supp.2d 1140, 1152 (E.D.Wash.2007) (finding three-year-old child to be well settled where evidence showed that child was (1) performing above grade level; (2) the child was "well-liked . . . [with] . . . a strong core of friends;" (3) the Respondent "routinely" took the child to "community cultural events;" and (4) the child had many relatives in the Western United States with whom the child would spend holidays.).

■ Furthermore, the Court's determination that Mother cannot avail herself of the exception for a child settled in a new environment is guided by several additional considerations. First, Father's petition was filed with this Court only a few weeks after the passage of the one-year time period that began to run when Father became aware of Mother's refusal to return M. to France. Second, during the one-year period beginning in March 2009, Father pursued legal remedies in French courts and obtained an order commanding M.'s return. Even though the French court in which Father sought relief lacked the power to grant a Hague Convention petition regarding a child located in the United States, the evidence indicates that Father was not resting on his rights but instead acting in good faith and with rea-

sonable diligence. In contrast, Mother refused to participate in the French proceedings after she received notice of them and, even at the Court's July 1st hearing, Mother appeared entirely unconcerned that a French court had entered a judgment adverse to her interests. Under the Hague Convention, it is of paramount concern that courts prevent a party in a custody dispute from deriving a benefit through wrongdoing. "In fact, a federal court retains, and should use when appropriate, the discretion to return a child, despite the existence of a defense, if return would further the aims of the Convention." *Friedrich II*, 78 F.3d at 1067 (citing *Feder v. Evans–Feder*, 63 F.3d 217, 226 (3d Cir. 1995) (citing Pub. Notice 957, 51 Fed. Reg. 10494, 10509 (1986))); *see England v. England*, 234 F.3d 268, 270–71 (5th Cir.2000); *see, e.g., Antunez–Fernandes*, 259 F.Supp.2d at 814–15 (concluding that return of children to France was appropriate because of respondent's misconduct even though petition was filed more than one year after the wrongful removal or retention and even though children had become settled in their new environment). Therefore, the Court concludes that Mother is not entitled to relief under Article 12.

### 2. *Article 13a: Exception for a Failure to Exercise Rights or Consent/ Acquiescence*

Under Article 13a, a court is not required to order the return of a child if the petitioner was not "actually exercising ... custody rights at the time of removal or retention, or had consented to or subsequently acquiesced in the removal or retention." Hague Convention, art. 13a. As described above, the Court finds that Father was exercising his rights of custody at the time Mother removed M. from France and then retained her in the United States. Mother, however, argues that Father consented to or subsequently acquiesced in M.'s removal or retention. Consistent with the Court's discussion of M.'s habitual residence, the Court finds that Father's consent for M. to travel to the United States to visit family and to remain with Mother during her treatment for cancer did not amount to consent for Mother to permanently remove M. from France and retain her in the United States. To the contrary, Father's consent was very limited. Father desired to have M. returned to France and began legal proceedings when it became apparent that Mother intended to keep M. in the United States indefinitely. Accordingly, Mother is not entitled to relief under Article 13a.

### 3. *Article 13b: Exception for Grave Risk of Physical or Psychological Harm or Placement of Child in an Intolerable Situation*

 Mother also argues that, pursuant to the exception created by Article 13b, M. should not be returned to France because doing so would expose her to a grave risk of physical or psychological harm or place M. in an intolerable situation. Grounds for relief under the Article 13b exception for a risk of harm or an intolerable situation exist only if the respondent shows, by clear and convincing evidence, an extreme situation that is "grave" and not merely "serious." *See Friedrich II*, 78 F.3d at 1068–69; *id.* at 1069 ("An example of an 'intolerable situation' is one in which a custodial parent sexually abuses the child."). Because the Hague Convention's framework generally envisions that the courts of the child's habitual residence will be adequately equipped to protect the interests of the child, the court hearing a petition for a child's return must refrain from using the Article 13b exception to engage in a comparative analysis of which parent is better suited to have primary custody of the child. *Id.* at 1068; *see Abbott*, 130 S.Ct. at 1995–96 ("It is the Convention's premise

that courts in contracting states will make this determination in a responsible manner.... International law serves a high purpose when it underwrites the determination by nations to rely upon their domestic courts to enforce just laws by legitimate and fair proceedings."). Thus, "in evaluating whether the person opposing the return of the child has established that there is a grave risk of harm, the court is not to make a determination of the child's best interest." *March v. Levine*, 136 F.Supp.2d 831, 843–44 (M.D.Tenn.2000), *aff'd*, 249 F.3d 462 (6th Cir.2001).

 Mother offered some argument at the Court's evidentiary hearing to suggest that returning M. to France would expose M. to danger because Father consumes alcohol. While Mother suggests that Father consumes alcohol to excess, she only testified to one specific prior example of his over-consumption. Mother's contention is also belied by her decision to relinquish M. to Father's care for extended periods of time—the most recent example of which occurred the weekend prior to the Court's July 1st hearing and involved Father alone caring for M. over several days. Mother's evidence is simply insufficient to carry her burden of proving a grave risk of harm or an intolerable situation by clear and convincing evidence. Furthermore, the Court emphasizes that ordering M.'s return to France is not the equivalent of ordering that M. be placed in Father's custody. The Court therefore concludes that Mother has not established a basis for relief under Article 13b.

#### 4. Article 20: Exception for Protection of Human Rights and Fundamental Freedoms

Mother makes no argument that an order directing the return of M. to France— a "first world" Western European liberal democracy—would be contrary to principles of the United States regarding the protection of human rights or fundamental freedoms. *See, e.g., Antunez–Fernandes*, 259 F.Supp.2d at 817 (granting petition for return of children to France); *see also Hazbun Escaf*, 200 F.Supp.2d at 614 (calling Article 20 a "seldom-cited and somewhat obscure provision" and directing the return of a child to Columbia).

#### 5. Article 13: Consideration for the Wishes of the Child

Finally, the Hague Convention allows a Court to consider the wishes of a child of sufficient age and maturity. Hague Convention, art. 13. The Court, however, did not hear from M., nor did any party attempt to relay M.'s wishes.

### D. Attorney Fees and Costs

 Under ICARA, "[a]ny court ordering the return of a child pursuant to an action brought under section 11603 of this title shall order the respondent to pay necessary expenses incurred by or on behalf of the petitioner, including court costs, legal fees, foster home or other care during the course of proceedings in the action, and transportation costs related to the return of the child, unless the respondent establishes that such order would be clearly inappropriate." 42 U.S.C. § 11607(b)(3). In determining the amount of reasonable attorney fees to be recovered under § 11607(b)(3), a court should not simply rely upon an affidavit from counsel stating that the rates charged comport with prevailing market rates. The court should instead utilize its own knowledge of the usual and customary rates in the market for the type of case when it has not been supplied with specific evidence of the prevailing rates in the relevant market. *Neves v. Neves*, 637 F.Supp.2d 322, 341–42 (W.D.N.C.2009) ("In the absence of specific evidence regarding the prevailing market rate, the Court may establish a reasonable rate based upon its own knowledge and experience of the relevant market

...."); *see Blum v. Stenson,* 465 U.S. 886, 896 n. 11, 104 S.Ct. 1541, 79 L.Ed.2d 891 (1984) ("[T]he burden is on the fee applicant to produce satisfactory evidence—in addition to the attorney's own affidavits—that the requested rates are in line with those prevailing in the community for similar services by lawyers of reasonably comparable skill, experience, and reputation."). Courts typically apply the lodestar method to calculate fees in cases arising under ICARA and the Hague Convention. *See, e.g., Wasniewski v. Grzelak–Johannsen,* 549 F.Supp.2d 965, 972 (N.D.Ohio 2008).

According to the evidence submitted at the Court's July 1st hearing, Father has thus far incurred attorney fees and expenses in the amount of $21,543.06 related to representation in this case by Father's counsel in Memphis—attorneys C. Suzanne Landers and Lucie Brackin of the Landers Firm. (July 1, 2010 Evid. Hr'g Ex. 19: Affidavit of Mr. Jean–Christophe Blanc's Attorneys Fees.) This amount includes $561.81 for photocopies, postage, advances, and research, while the remaining balance of $20,981.25 comprises attorney and paralegal fees. More specifically, Father's attorneys have billed as follows: one hour for Ms. Landers at the rate of $300 per hour; 31.50 hours for Ms. Landers at the rate of $375 per hour; 35.35 hours for Ms. Brackin at the rate of $250 per hour; and .25 hour of paralegal time at the rate of $125 per hour.

■ The Court finds that the hourly rates charged by Ms. Landers and Ms. Brackin—as well as the rate charged for work by their paralegal—are excessive and unreasonable given the usual and customary rates in the Memphis legal market and the nature of this case.[14] *See, e.g., Ford v. Tennessee Senate,* No. 2:06–cv–2031, 2008 WL 4724371, at *5 (W.D.Tenn. Oct. 24, 2008) (finding $250 per hour and $200 per hour to be reasonable rates for partners and $140 per hour to be a reasonable rate for an associate at a prominent law firm in the Memphis community performing work in a sophisticated civil rights case) (citing *Isabel v. City of Memphis,* 404 F.3d 404, 415–16 (6th Cir.2005) (finding a rate of $250 per hour to be reasonable) and *Vaughan v. Memphis Health Center, Inc.,* No. 03–2470 Ma/V, 2006 WL 572694, at *1 (W.D.Tenn. Mar. 8, 2006) (finding an hourly rate of $200 to $225 per hour to be reasonable)). The Court notes that this case did not involve extensive discovery or multiple filings with the Court and that review of the billing records submitted by Father's counsel indicates that little of either attorney's time was devoted to any particularly complex issue of law.[15] The

**14.** While Ms. Landers's affidavit states that she has been an attorney licensed in the State of Tennessee for twenty-five years and that her practice consists solely of domestic relations cases, her affidavit is silent as to Ms. Brackin's qualifications and experience. The website of the Tennessee Board of Professional Responsibility, however, reflects that Ms. Brackin has been a licensed attorney since 2001 and has been licensed in Tennessee since 2003.

**15.** There is also some reason to believe that Ms. Landers and Ms. Brackin may have billed for performing tasks that could be described as "administrative" and thus did not require an attorney's time. Similarly, the Court is

not convinced that Ms. Brackin's work was not in some instances duplicative of Ms. Landers's or otherwise unnecessary. While ICARA enables a prevailing petitioner to recover reasonable attorney fees, a petitioner is not entitled to have the losing respondent subsidize the petitioner's selection of the most expensive attorneys and modes of representation. *Cf. Coulter v. State of Tenn.,* 805 F.2d 146, 149 (6th Cir.1986) ("Under these statutes a renowned lawyer who customarily receives $250 an hour in a field in which competent and experienced lawyers in the region normally receive $85 an hour should be compensated at the lower rate. We therefore apply the principle that hourly rates for fee awards should not exceed the market rates necessary

Court will therefore reduce the hourly rate for Ms. Landers to $215 per hour and the hourly rate for Ms. Brackin to $135 per hour, which rates the Court finds to be fair and reasonable for the Memphis market and the nature of this case.[16] Accordingly, the Court awards attorney fees for Ms. Landers at the rate of $215 per hour for 32.50 hours of work for a total of $6,987.50 and awards attorney fees for Ms. Brackin at the rate of $135 per hour for 35.35 hours for a total of $4,772.25. The Court will reduce the charge for .25 hour of paralegal time to $65 per hour for a total of $16.25. Thus, the overall total amount of reasonable attorney fees and costs owed to the Landers Firm by Mother is hereby set at $12,337.81.

In addition to the affidavit and time-sheets from Ms. Landers, Father submitted an itemization of total expenses incurred for this case. (July 1, 2010 Evid. Hr'g Ex. 18: Mr. Blanc's Fees and Expenses; U.S. District Court/Western Dist. TN Case No. 2:10–cv–02314.) When the amount of fees and costs stated as owed to the Landers firm is deducted from this listing, the amount requested equals $6,405.89. This figure includes $1,799.26 for representation of Father by counsel in France. As the Court has been presented with no evidence that the amount charged by his French counsel is reasonable and customary (regardless of whether Memphis, Tennessee or Montpellier, France is deemed to be the relevant legal market), how the fee was calculated, or even why these fees were necessary, the Court declines to award any amount for representation of Father by his counsel in France. Also included in the list are entries of

$1,421.59 for plane reservations and $1,270.95 for hotel reservations for a stay in Memphis from June 24 to July 3, 2010. Lodging and transportation expenses, if reasonable and related to the litigation, are recoverable under § 11607(b)(3). *See, e.g., Neves,* 637 F.Supp.2d at 344. The Court finds these amounts to be reasonable and thus grants Father's request for these amounts. The remaining expenses listed in the itemization all appear to be for translation services, process servers, and other incidental expenses contemplated by § 11607(b)(3). In sum, the Court finds that the total amount of reasonable attorney fees and costs properly awarded to Father pursuant to § 11607(b)(3) is $16,944.44.[17]

**E. Summary**

The Court is acutely aware of the gravity of the issues presented by this case. The Court is also mindful of its obligation under the Hague Convention and ICARA to ensure that child custody disputes between parents located in different countries are resolved in accordance with fixed and predictable legal principles that discourage forum shopping and parental abduction. *See generally Altamiranda Vale v. Avila,* 538 F.3d 581, 583 (7th Cir.2008) (Posner, J.). Having found that France was M.'s habitual residence prior to her being removed to and retained in the United States, that Father was exercising his custodial rights prior to Mother's wrongful actions, that Mother's actions interfere with Father's rights under the law of M.'s habitual residence, and that Mother is not entitled to relief under any of the narrow

---

to encourage competent lawyers to undertake the representation in question.").

**16.** Some courts have awarded even lower rates under § 11607(b)(3). *E.g., Wasniewski,* 549 F.Supp.2d at 980 (awarding between $175 and $130 per hour for each of petition-

er's attorneys in ICARA/Hague Convention case).

**17.** Mother has not argued that an award of attorney fees and costs would be "clearly inappropriate" or otherwise challenged Father's request.

exceptions recognized by the Hague Convention and ICARA, the Court concludes that M. must be returned to France to allow French courts to adjudicate the rights of custody between Mother and Father. The Court emphasizes that this decision does not in any way address the merits of the custody dispute between Mother and Father. The Court further emphasizes that this order does not require that M. at any point be placed into Father's custody. Provided the parties comply with the Court's order, Mother and Father are free to decide between themselves the means and manner of M.'s return to France.

### III. CONCLUSION

For the reasons stated above, Father's petition is **GRANTED,** and the Court directs Mother to take all appropriate steps to ensure that M. is returned to France within thirty (30) days of the date of this order. Mother may personally return M. to France or place M. in Father's custody to be returned. M. may not be placed into the care or control of a third party for her return without the Court's express permission. Pending her return to France, M. shall not—absent leave of the Court—be removed from the jurisdiction of the United States District Court for the Western District of Tennessee for any purpose other than to effect her return. Counsel for Mother shall file a notice with the Clerk of Court immediately upon M.'s arrival in France indicating that Mother has thereby complied with the terms of this order. The parties are admonished that the willful failure to comply with the terms of this order shall constitute contempt of court and may result in the imposition of a fine and/or imprisonment. Father's request that M.'s name be entered into the national police computer system (N.C.I.C.) missing person section is denied. Pursuant to 42 U.S.C. § 11607(b)(3), the Court taxes Mother with reasonable attorney fees and costs incurred to date in the amount of $16,944.44 payable to Father. Judgment shall immediately enter in favor of Father.